**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| Beijing Daxing Huaxin Xingbang Science and Technology Development Research Center, Individually and on behalf of all others similarly situated | ) ) ) ) ) ) | |
| And | ) ) | |
| HXXB USA Research Center, Individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CASE NO.   1:25-cv-1981 |
| Ken Paxton, | ) ) | |
| In his official capacity as Attorney General for the State of Texas | ) ) ) | |
| Defendant. | ) ) | |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs, Beijing Daxing Huaxin Xingbang Science and Technology Development Research Center ("HXXB") and its wholly owned subsidiary, HXXB USA Research Center ("HXXB USA"), on their own behalf and on behalf of the purported class, bring this Complaint requesting that this Court declare S.B. 17, Sections 5.253(2)(A) and (C) and subsection (3) and Section 5.255(e)[1], effective September 1, 2025 (collectively, hereinafter referred to as the "Challenged

---

[1] Codified at TEX. PROP. CODE §§ 5.005, 5.251-258.

1

Provisions"), as unconstitutional and permanently enjoin the Attorney General from enforcing the Challenged Provisions.

## JURISDICTION

1. This Court has federal question subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has the authority to provide relief to Plaintiffs under 28 U.S.C. § 2201.

2. Plaintiffs' claims arise under the Commerce Clause of Article I, Section 8, Clause 3 of the United States ("U.S.") Constitution. The Commerce Clause prevents states from enacting laws or regulations that discriminate against or unduly or excessively burden interstate commerce. State laws or regulations that explicitly exclude foreign entities due to excessive protectionism are facially discriminatory and, *per se*, invalid. *See Hignell-Stark v. City of New Orleans*, 46 F.4th 317 (5th Cir. 2022) (holding that a city ordinance that forbade non-residents from participating in the market discriminated against interstate commerce on its face); *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 485 (2023) (holding that a statute that prevented those without an existing presence in the state from ever entering the market was likely unconstitutional under the Commerce Clause).

3. Additionally, Plaintiffs' claims arise under the Supremacy Clause of Article VI of the U.S. Constitution. Under the Supremacy Clause, the Challenged Provisions are preempted, and thus facially rendered null and void against Plaintiffs, by the well-entrenched field preemption and conflict preemption doctrines. *See United States v. Texas*, 144 F.4th 632, 674-675 (5th Cir. 2025) ("There is nearly 150 years of Supreme Court precedent suggesting that the power to control the entry and removal of aliens is 'vested solely in the Federal Government, rather than the States…. If every state could regulate the unlawful entry,

reentry, and removal of aliens, '[e]ach additional statute [would] incrementally diminish[] the [federal government]'s control over enforcement' and 'detract[] from the 'integrated scheme of regulation' created by Congress.'"); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 526 (5th Cir. 2013) (holding that state and local laws are preempted where compliance with both federal and state regulations is impossible).

4. Finally, Plaintiffs' claims arise under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Due process requires that a governmental body exercise jurisdiction only where a party has fair notice and sufficient minimum contacts such that the assertion of authority comports with "traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The State cannot lawfully seize, redirect, or burden property in the absence of lawful jurisdiction and a procedurally adequate opportunity to be heard.  Nor can a person or entity be subjected to the threat of civil or criminal referral where these constitutional prerequisites are not met.

5. As described in greater detail below, Plaintiffs' injury in fact is immediate and imminent. *See* Ex. A, Declaration of Yu Zhang at ¶¶ 47, 59. Plaintiff, HXXB USA immediately wants to lease, with HXXB serving as guarantor, property in Austin, Texas, and has actively worked with landlords/brokers in the area. It has paid deposits and overhead costs in this regard. *See* Zhang Decl. at ¶ 46; *see also* Exhibit G-1.[2]

6. Plaintiffs, thus, have standing to bring this lawsuit as: (1) Plaintiffs not only have an intention to engage in a course of conduct affected by the Challenged Provisions, they have actively attempted to do so but their efforts have been thwarted by these constitutionally

---

[2] *Compare against Yifan Shen v. Commissioner*, No. 23-12737, 2025 U.S. App. LEXIS 28902, at *1 (11th Cir. Nov. 4, 2025) (An increased regulatory burden satisfies the injury in fact requirement for standing purposes…. None of the appellants had standing to challenge the purchase restriction because *__none__* intended to engage in conduct the purchase restriction arguably proscribed).

infirm provisions; (2) were Plaintiffs to enter a lease for more than one year (which they will not while the Challenged Provisions remain in effect [3]) such conduct would unquestionably be proscribed by the Challenged Provisions; and (3) the threat of harm to Plaintiffs from the Challenged Provisions is not only substantial, itis real and imminent. Indeed, the Challenged Provisions are presently injuring and will continue to injure Plaintiffs if the provisions are not rendered null and void.[4][5] These unassailable facts show this case is also ripe for review.[6]

7. This Court has jurisdiction over defendant, Attorney General Ken Paxton, under the *Ex parte Young* doctrine, 209 U.S. 123 (1908), which authorizes suits against state officials in their official capacities and authority to declare unconstitutional harms and enjoin ongoing violations. Pursuant to *Ex parte Young* and 28 U.S.C. § 1331, the Court has the power to declare the Challenged Provisions as unconstitutional under the Commerce Clause and the Supremacy Clause of the United States Constitution. 28 U.S.C. § 2201(a). This Court also has jurisdiction over the Attorney General under 42 U.S.C. § 1983. Section 1983 provides jurisdiction for this Court to redress constitutional injuries where a state official exceeds

---

[3] *See* Zhang Decl. at ¶¶ 57-58.

[4] *See Inst. for Free Speech v. Johnson*, 148 F.4th 318 (5th Cir. 2025) ("A plaintiff may demonstrate an injury in fact if it: "(1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) its intended future conduct is arguably proscribed by the law in question, and (3) the threat of future enforcement of the challenged law is substantial.").

[5] It is important to note that the Southern District's recent opinion in *Peng Wang v. Paxton*, No. 4:25-cv-03103, 2025 LX 366130 (S.D. Tex. Aug. 18, 2025), although not binding on this Court, is wholly inapposite to this present matter as: (1) Plaintiffs have shown a present intent to enter the commercial real estate market in Texas and (2) S.B. 17 does not require action on the part of the Attorney General to immediately void a lease—the injury is immediate. *See* § 5.255(e). Similarly, while not binding on this Court, the recent 11th Circuit opinion in *Yifan Shen v. Commissioner* (cited *supra*) is inapposite because (1) unlike Plaintiffs here, the Plaintiffs in that matter admitted they had no present intention to acquire real property and, more importantly (2) the registration and affidavit requirements at issue "[did] not prohibit or otherwise restrict anyone from completing transactions that the federal foreign investment review regime ***would otherwise allow***." *Id.* at *68 (emphasis supplied). That most certainly is not the case here—it is the exact opposite.

[6] *Id.*

lawful authority and interferes with protected liberty and property interests without adequate notice, hearing, or a valid jurisdictional basis.

8. Venue is proper in this Court because a substantial part of the events giving rise to the claim occurred within this district. Additionally, venue is proper because HXXB USA, and HXXB as guarantor, want to immediately lease property within this judicial district for a term of at least two years. 28 U.S.C. § 1391(b)(2).

9. Venue is also proper in this district because defendant, Attorney General Ken Paxton, sued in his official capacity, has his main office in this district. 28 U.S.C. § 1391(b)(1).

## PARTIES

**A. Plaintiffs.**

10. Plaintiff, HXXB, is a non-profit, privately operated research institution headquartered in Daxing, Beijing, China. *See* Zhang Decl. at ¶ 10. HXXB was founded by persons unaffiliated with the Chinese Communist Party ("CCP") to research and enhance semiconductor technology. *Id.* at ¶¶ 12, 15. HXXB's work focuses on design verification, application, and transfer of specialty chips for small appliances and intelligent devices. *Id.* at ¶ 15.

11. HXXB is a People-Run-Non-Enterprise Unit ("PRNEU"), which is the Chinese equivalent of a United States, 26 U.S. Code § 501(c)(3) non-profit organization. PRNEUs are private non-profit entities that, pursuant to Chinese law, are ***legally independent*** from the Chinese government and the CCP.[7] *See* Zhang Decl. at ¶ 11; *see also* Ex. A-1.

---

[7] *See* Regulations on the Registration and Administration of People-Run Non-Enterprise Units, Article II (State Council Order No. 230, promulgated Dec. 4, 1998, amended 2018) (The PRNEWs referred to in these Regulations mean enterprise institutions, societies and other social forces as well as social organizations established with *non-state-owned assets* by *individual citizens* for non-profit social services.).

12. Plaintiff, HXXB USA, is a wholly owned subsidiary of HXXB. *See* Zhang Decl. at ¶ 18. All of HXXB USA's stock is owned by HXXB. *Id.*; *see also* Ex. B-1. HXXB USA is a non-profit entity incorporated in Michigan that is actively seeking to conduct business and lease commercial office space in Austin, Texas. Zhang Decl. at ¶¶ 20, 39-40.

**B. Defendant.**

13. Defendant, Ken Paxton, is the Attorney General for the State of Texas. He is authorized to investigate and enforce alleged violations of S.B. 17. Furthermore, the Attorney General may refer potential violations to the proper law enforcement agencies. TEX. PROP. CODE §§ 5.255, 5.257(a)(2).

14. The Attorney General can bring a civil enforcement action against a company or entity, like Plaintiffs, that allegedly violate S.B. 17., *codified at* TEX. PROP. CODE § 5.259. Entities like HXXB and HXXB USA, who allegedly knowingly or intentionally violate S.B. 17, could subject their owners or members to criminal enforcement. TEX. PROP. CODE §§ 5.258(a-b). While S.B. 17 does not specify a penalty range, Texas law supports that punishment for committing an alleged felony can range from 180 days to 2 years. *See* TEXAS PENAL CODE § 12.35.

**<u>FACTS</u>**

**A. Challenged Provisions.**

15. On June 20, Governor Greg Abbott signed into law S.B. 17, ushering in a discriminatory regime that bars individuals subject to the bill from owning, purchasing, or leasing real property, premised on unsubstantiated fear-mongering and stereotypes. While Plaintiffs view S.B. 17 in its entirety as an affront to fundamental constitutional guarantees, this claim

6

focuses on the Challenged Provisions—those sections that most immediately and directly inflict harm upon Plaintiffs.

16. The portions of the Challenged Provisions, effective as of September 1, 2025, relevant to this claim cover the following individuals and entities:

   a. A company or organization that is headquartered in China;

   b. A company or organization owned by a company or organization headquartered in China; or

   c. A company or organization owned by, or the majority of stock or ownership interested owned by an individual who is domiciled in China and an individual who is a citizen of China but is domiciled elsewhere—except Russia, Iran, and North Korea—but is not a citizen or a lawful permanent resident of that country.[8]

17. Entities, such as Plaintiffs, and others similarly situated, are categorically prohibited from purchasing commercial space or leasing commercial space where the lease term is greater than one year. TEX. PROP. CODE §§ 5.253, 5.254. All leases that violate the vague terms of S.B. 17 are immediately rendered null and void. TEX. PROP. CODE § 5.255(e).

18. There are no subsequent procedures that the Attorney General needs to promulgate to effectuate this statutory language—the Challenged Provisions are self-executing. *Id.; compare against Yifan Shen v. Commissioner*, at *65 (holding that Florida Senate Bill 264 was constitutionally distinguishable from the "Cuba Amendment" because it did not prevent "any company that [did] business in Cuba—or that [was] in any way related to a

---

[8] To be clear, Plaintiffs are narrow tailoring their lawsuit to the portions of S.B. 17 that have an immediately cognizable impact on them. Plaintiffs are not claiming to have standing over all persons or entities impacted by S.B. 17, nor are they seeking class certification beyond those similarly situated to them. *Contrast with*, *Peng Wang v. Paxton*, No. 4:25-cv-03103, 2025 U.S. Dist. LEXIS 159896, at *22 (S.D. Tex. Aug. 18, 2025) (The conduct intended by Plaintiffs, meaning in turn that none of their _intended_ conduct—whether buying a homestead, leasing a residence for more than a year, or purchasing a residential investment property—has the potential for constitutional injury. The prohibition in S.B. 17 against real estate transactions does not apply to them and they have no standing to bring these claims.).

company that [did] business in Cuba—from bidding on state or local public contracts in the State of Florida," which would be preempted by a federal sanctions regime.).

19. The exemptions to S.B. 17, albeit unconstitutionally restrictive, vague, and unsound, allow Chinese persons who are lawfully present in the United States from acquiring a residential homestead real property interest, TEX. PROP. CODE § 5.252, as can those persons who want to lease property for less than one year. *Id.* However, these are exceptions that merely prove the unconstitutionally infirm foundation of S.B. 17—there is no reasonably legitimate basis that exists for an entity to be able to own a residential property in Texas or rent a commercial property for less than a year, but prevents that same entity with a legitimate, good faith interest in investing in Texas from leasing a property for more than a year. The disparate treatment is facially arbitrary and capricious under the United States Constitution.[9]

20. In its Authors'/Sponsors' Statement of Intent, the Texas Senate asserted that S.B. 17 is intended to "protect key land and natural resources from hostile countries and their actors named in the three most recent Annual Threat Assessment reports prepared by the Director of National Intelligence." S.B. 17, Author's/Sponsor's Statement of Intent at 1 (March 4, 2025).[10]

21. According to Texas Senate report, S.B. 17 was adopted pursuant to Texans' national security concerns. *Id.* To address those concerns, the State of Texas purports to prevent "private property rights from being controlled by entities from adversarial nations."

---

[9] The draft bill initially under consideration prohibited leasehold interests greater than 100 years. The final version limited it to one. *See* original draft, § 5.253(4), available at: https://capitol.texas.gov/tlodocs/89R/billtext/html/SB00017S.htm (last visited on November 30, 2025). No rational basis exists for limiting the prohibition on leasehold interests to one percent of what was originally contemplated.

[10] *Available at https://legiscan.com/TX/supplement/SB17/id/537282/Texas-2025-SB17-Analysis_Introduced_.html (last visited Aug. 2, 2025).*

According to the Texas Senate report, preventing adversarial nations from acquiring private property rights is key to ensuring the State's and national security interests. *Id*.

22. The final Texas Senate report emphasizes that the "goal of this bill is to legislate ***common sense safeguards*** against the ***regimes*** identified as threats in the Annual Threat Assessment…" not to punish good-faith actors.[11] However, other than association with a Chinese-domiciled individual or entity, the term "hostile foreign entity" is not defined by the bill.

23. To enforce the law, the report says that it "creates a criminal offense, increases the punishment for an existing criminal offense or category of offenses, or changes the eligibility of a person for community supervision, parole, or mandatory supervision." *See Id*.

24. In its final enacted form, the Texas law expands the reach of the bill from preventing "adversarial ***nations***" to preventing "hostile foreign ***actors***" from owning property in Texas. *Id*.

25. Other than the national origin of who owns or controls an entity, the bill as codified fails to provide any guiding principles as to what qualifies an entity as being a "hostile foreign actor." Thus, the Challenged Provisions do not only apply to foreign hostile governments, but also cover noncitizen individuals and entities, irrespective of said citizens' or entity's affiliation with any foreign government, let alone a hostile one. Organizations like HXXB, that are headquartered in a designated country, and its subsidiary HXXB USA, which is owned and controlled by HXXB but is duly organized in the United States under Michigan law, have fallen victim to the State of Texas' sweeping law, despite ***no affiliation*** with the

---

[11] Available at https://legiscan.com/TX/supplement/SB17/id/537282/Texas-2025-SB17-Analysis_Introduced_.html (last visited Aug. 2, 2025) *(emphasis supplied)*.

Chinese government or the CCP. *Id*. This can, in no meaningful sense of the term, be described as a "common sense safeguard." The "sense" is wholly lacking and harkens to a dark, widely condemned era in United States jurisprudence where national origin was destiny. *See e.g., Fuji v. State*, 242 P.2d 617 (1952) (holding that the Alien Land Law violated the constitution).

26. The final Texas House report states that "the acquisition of real property by ***hostile foreign entities*** in Texas poses threats relating to espionage, surveillance, and undue hostile foreign influence, all of which risk state security." S.B. 17, Homeland Security, Public Safety, & Veterans' Affairs Committee, Committee Report at 1 (May 1, 2025).[12] However, there are explicit federal regulations that detail the investigatory process for determining if a foreign entity presents a national security threat.[13] Not only does S.B. 17 conflict with federal law, it wholesale ignores it. S.B. 17 has put on blinders when it comes to federal law and automatically voids any lease over a year entered by a subsidiary of a Chinese entity and subjects the lessee and its personnel to the Attorney General's enforcement power. This— without any need by the Attorney General to show the lessee presents a reasonable security threat. How can a federally required determination be made that an entity presents a reasonable security threat when such determination is never required to be established in the first instance? It cannot under current Texas law, rendering the Challenged Provisions irreconcilable with federal law.

27. In short, the draconian, far-reaching, and ironclad prohibition against a foreign-affiliated company leasing commercial space in Texas for more than a year is proscribed by federal

---

[12] *Available at  https://legiscan.com/TX/supplement/SB17/id/589432/Texas-2025-SB17-Analysis_House_Committee_Report_.html (last visited Aug. 2, 2025).*
[13] *See, e.g.,* bis.gov/entity-list (last visited on November 17, 2025).

law and the U.S. Constitution, and is, frankly, incompatible with the bedrock constitutional principles of fundamental fairness and justice.

28. The State of Texas is explicitly[14] not interested in curtailing investment from China into the State, but leasing commercial office space, for reasons unexplained, is prohibited. Other investments are welcome. *Id.*  As the disparate treatment accorded to foreign real estate investments in Texas have no legally cognizable justification under the bill, the bill simply cannot pass the muster of rational basis review.

29. As detailed *supra*, the Attorney General is exclusively vested with enforcement authority over S.B. 17, *codified at* TEX. PROP. CODE §§ 5.255, 5.256. This includes the ability to refer an alleged violation of S.B. 17 to local authorities for prosecution. *Id*. § 5.255(c)(2). After investigating alleged violations of S.B. 17, a court may refer individuals for prosecution. *Id*. § 5.256(a)(2). If found guilty of violating the statute, individuals can be sentenced to between six months and two years in prison. *Id*. § 5.258(b).[15]

30. However, as mentioned above, a violation of S.B. 17 is automatically inferred by the bill and can be immediately enforced against any person or entity subject to the law seeking a leasehold interest in Texas exceeding a year. § 5.255(e). In the context of a leasehold interest, the bill, on its face, does not require the Attorney General to promulgate any procedures for determining if a violation of the bill occurred—so long as an entity or individual is subject to the bill (i.e. they are Chinese) a *prima facie* violation of the bill is

---

[14] *Available at https://legiscan.com/TX/supplement/SB17/id/589432/Texas-2025-SB17-Analysis_House_Committee_Report_.html (last visited Aug. 2, 2025)* ("This bill bans private property ownership by named entities, ***not foreign business investments*** in Texas.").
[15] *See also* TEX. PENAL CODE § 12.35.

established. *Id*. Strict liability offenses of this nature have long been strongly disfavored by U.S. Supreme Court jurisprudence.[16]

31. Well-established U.S. Supreme Court precedent further holds that where a statute punishes wholly passive behavior without investigation or notice of wrongdoing, conviction under it offends fundamental fairness of due process and is unconstitutional. *Lambert v. California*, 355 U.S. 225, 228–30 (1957). In addition, extending felony "public welfare" liability offenses in strict liability matters impermissibly criminalizes morally innocent conduct.[17]

32. Similarly, the Attorney General can bring a civil action against an entity for violating the law. If a violation is established under the arbitrary criteria set forth by the bill, an entity is subject to penalty for the greater of $250,000 or 50% of the market value of the interest in real property that is the focus of the violation. TEX. PROP. CODE §§ 5.259(a-b).[18] The bill makes divestiture automatic. Where, as here, divestiture of a property interest is automatic

---

[16] *Morissette v. United States*, 342 U.S. 246, 247, 72 S. Ct. 240, 241 (1952) (For invasions of rights of property, the penalty is high and, when a sufficient amount is involved, the infamy is that of a felony, which is as bad a word as you can give to man or thing. State courts of last resort, on whom fall the heaviest burden of interpreting criminal law in this country, consistently retain the requirement of intent. The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.); *Dennis v. Higgins*, 498 U.S. 439, 446 ("We further conclude[ ] that 'the dichotomy between personal liberties and property rights is a false one. . . . The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right, whether the 'property' in question be a welfare check, a home, or a savings account.'").

[17] *Staples v. United States*, 511 U.S. 600, 602 (1994) (Granting certiorari and reversing on the basis that the harsh penalty that attached to a violation of challenged statute provided support for the proposition for a *mens rea* requirement).

[18] *Id.* at 263. (The Government asks us by a feat of construction radically to change the weights and balances in the scales of justice. The purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries. Such a manifest impairment of the immunities of the individual should not be extended to common-law crimes on judicial initiative).

without any consideration for due process, a constitutional violation is presumed. Indeed, this is a textbook violation of the Due Process Clause of the U.S. Constitution.[19]

B. **HXXB USA, a Duly Incorporated U.S. Non-Profit that is a Subsidiary of HXXB, a Chinese Non-Profit Corporation Headquartered in Beijing, China, Wants to Lease Office Space in Austin, Texas to Conduct Semiconductor Research.**

33. As mentioned, *supra*, in 2022, HXXB was incorporated as a People-Run-Non-Enterprise Unit ("PRNEU") that is headquartered and registered in Daxing, Beijing, China. Under Chinese law, HXXB is **_required_** to be free from governmental assets. This is a legal requirement, not an option, and HXXB fully complies with same. Zhang Decl. at ¶¶ 10-11.

34. HXXB has a humanistic, international outlook. *Id*. at ¶¶ 15-16.

35. *HXXB does not have any ties to the Chinese government or the Chinese Communist Party*— a fact particularly pertinent to this claim. *Id*. at ¶¶ 10-12, 61.

36. HXXB is also not a contractor or agent of the Chinese government. HXXB is not a contractor or agent of the CCP. *Id.*

37. Plaintiff, HXXB USA, is a wholly owned subsidiary of HXXB organized in the United States as a 501(c)(3) non-profit. *Id*. at ¶ 18.

38. Plaintiffs are a semiconductor chip research and design institute. Plaintiffs focus on specialty chip design, chip verification, and tech transfer. Plaintiffs' mission is to advance semiconductor innovation for the public, **_not_** for the CCP's, or **_any_** foreign adversary's,

---

[19] U.S. CONST. AMEND. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."); *see also*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 793 (2005) (At the very least, due process requires that the relevant state decisionmaker listen to the claimant and then apply the relevant criteria in reaching his decision. The failure to observe these minimal procedural safeguards creates an unacceptable risk of arbitrary and "erroneous deprivation[s]".); *Fuentes v. Shevin*, 407 U.S. 67, 69 (1972) (The central meaning of procedural due process is clear, as parties whose rights are to be affected are entitled to be heard, and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.).

13

benefit. Plaintiffs seek to accomplish this ***global*** mission by training the next generation of semiconductor engineers based on their merit, whether in the U.S. or abroad, foster global, cross-border research and development collaboration, and to support underserved startups with design and support. *Id*. at ¶¶ 15, 27-34.

39. Plaintiffs strongly believe their mission is best served by establishing research and development as well as sales operations in Austin, Texas as the city is a nationally recognized semiconductor hub. *Id.* ¶¶ 21-26; 39. As mentioned, *supra*, Plaintiffs' ambition is to partner with individuals and entities in the State of Texas in furtherance of advancing human technology, not the CCP's, or any other adverse country's, technology. *Id.* at ¶¶ 28-34.

40. Plaintiffs also seek to grow the State of Texas' tax base, and estimate that through 2029, Plaintiffs' revenues in Austin will grow from $500,000 to $7.5 million. *Id.* at ¶¶ 35-38.

41. According to a 2025 IBIS world report, Texas ranks second in the U.S. in both semiconductor revenue at $12.8 billion, and employment with 17,303 technology workers. The report also states that semiconductor manufacturing jobs in this industry are well compensated. The average wage for employees in the semiconductor industry in Texas is $185,000 annually. This is the second highest rate of compensation for this sector of the industry in the country. *Id.* at ¶¶ 21, 23; *see also* Ex. E-1.

42. Travis County, which encompasses Austin, Texas, is the semiconductor hub in the State of Texas. Travis County accounts for 25% of all semiconductor operations in the State. Additionally, Travis County generates $3.1 billion in tax revenue, nearly 25% of the total statewide revenue. *Id.* at ¶ 22.

43. The greater Austin region also boasts several prominent semiconductor companies such as NXP Semiconductors, Silicon Labs, and AMD, and serves as a magnet for worldwide semiconductor talent. *Id.* at ¶ 24.

44. The University of Texas at Austin intends to add a master's degree program later this year, entitled Master of Science in Engineering, emphasizing Semiconductor Science.[20] *Id.* at ¶ 25.

45. Furthermore, research shows the household appliance sector in Texas needs innovation for the State's millions of residents, who are only growing by the year. Plaintiffs endeavor to assist in updating the technology in this sector. *Id.* at ¶ 31.

46. Plaintiffs intend to collaborate with the University of Texas at Austin and Austin Community College. Plaintiffs intend to provide research fellowships to both students and faculty. Through doing this work, Plaintiffs intend to further their mission of building the next generation of semiconductor workers who understand both the theory and application of the technology, and how it can be applied to further enhance the combined human experience. *Id.* at ¶ 29.

47. Plaintiffs intend to serve both the Texas state and local governments as a partner in providing access to technology for all, in a sustainable manner, and with full transparency. *Id.* at ¶ 30.

48. Plaintiffs also intend to work with original equipment manufacturers and semiconductor integrators. Furthermore, appliance and consumer electronic manufacturers throughout Texas will benefit from Plaintiffs' low-power and modular chip offerings that are tailored for energy-efficient smart systems. *Id.* at ¶ 31.

---

[20] *See* https://cockrell.utexas.edu/academics/graduate-education/programs/semiconductor-science-and-engineering/

49. HXXB USA will also collaborate with Texas-based startup companies and entrepreneurs by offering affordable semiconductor design services as well as helping startups navigate IP licensing. *Id.* at ¶ 32.

50. HXXB USA also wants to partner with the Austin area community to ensure that innovation opportunities are available to all Texans. *Id.* at ¶ 33.

51. To accomplish their mission and achieve their long-term goals, it is imperative that HXXB USA open a commercial office space in the greater Austin, Texas region, with HXXB serving as guarantor, for a multiyear lease term. *Id.* at ¶¶ 39, 60.

52. To this end, Plaintiff HXXB USA has actively attempted to lease commercial office space in Austin, Texas. As evidence thereof, Plaintiff HXXB negotiated[21] two leases (with HXXB serving as guarantor), which have already been signed by the respective landlords and are ready to be executed. *Id.* at ¶¶ 41-42, 44; *see also* Ex. F-1. It also has, to date, issued several thousands of dollars in deposits and otherwise spent a significant amount on overhead costs, for which it has not been recompensed. *Id.* at ¶ 46; *see also* Ex. G-1.

53. To summarize, HXXB USA's Austin office, if the Attorney General allows to come to fruition, intends to serve as a non-profit hub dedicated to research, workforce training, and the development of socially impactful technologies that have no material relationship to the CCP. *Id.* at ¶ 27.

54. However, because of S.B. 17, HXXB USA cannot finalize execution of the leases for fear of criminal and civil penalties. *Id.* ¶¶ 56-58. Importantly, but for the Challenged Provisions, HXXB USA would at the time of this filing have already begun occupying the commercial

---

[21] As part of this process, Plaintiff HXXB's financial condition was evaluated and approved by the landlords. *Id.* at ¶ 43. This demonstrates that Plaintiffs are not only willing to enter a lease immediately, but that they are able to do so.

office space for which it has painstakingly negotiated and has already spent thousands of dollars securing. *Id.* at ¶ 45.

55. HXXB is not listed on, ***nor has it ever been listed on***, the U.S. Department of Defense's list entitled: "Entities Identified as Chinese Military Companies Operating in the United States in Accordance with Section 1260H William M. ("MAC") Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116-283)." *Id.* at ¶ 13.

56.  The Attorney General cannot point to ***any*** state or national security threat presented by either Plaintiff, nor is the Attorney General required to do so under S.B. 17 before he is empowered to enforce draconian measures against an individual or entity that is subject to the bill and wishes to enter a multiyear lease. Any investigation, as required by federal law but is not required under S.B. 17, would find that neither Plaintiff presents ***any*** security threat. In fact, Plaintiffs' mission is wholly aligned with the State of Texas' interests of protecting the State's security ambitions. *See* Zhang Decl. at ¶16.

57. For this reason, there is no rational, meaningful, or legitimate State interest in prohibiting Plaintiffs from leasing commercial office space. The bill is anathema to United States constitutional principles and is clearly seeped in a Soviet concept of justice embodied in the maxim: "show me the man, and I'll show you the crime," as it presumes wrongdoing based solely on who a person or entity is. In short, the Challenged Provisions do not only conflict with the core principles of the U.S. Constitution, they turn such principles on their head.

58. To reemphasize, neither Plaintiff is affiliated with the Chinese government or the CCP. Zhang Decl. at ¶¶ 10-12, 61. They wish only to conduct research and development on behalf of humanity, not a particular government entity. *See* generally, Zhang Decl. S.B. 17

17

prevents them from doing so. There are no checks and balances in place under S.B. 17 that would prevent the Attorney General from referring Plaintiffs for civil and criminal penalties for leasing any commercial office space in Austin, Texas, simply because of the national origin of the owners or operators of Plaintiffs. Clearly, more narrowly tailored means are available for the State to achieve its objectives without an arbitrary and capricious law untethered to any federally required reasonably and substantiated national security threat.

C. **HXXB USA Wishes to Retain Employees to Further Its Mission but Cannot Do So Without Entering a Multiyear Commercial Lease.**

59. HXXB USA has retained a full-time U.S. citizen employee in the greater Austin, Texas area. This fact not only cements evidence of Plaintiff's commitment to actively entering the Texas market, but its immediate need for commercial office space. *See* Zhang Decl. at ¶ 49.

60. Once HXXB USA is lawfully permitted by the State of Texas to secure a commercial office space in the greater Austin area (which it currently is not), in addition to its U.S. citizen or permanent resident employees or consultants, HXXB USA intends to retain employees under an L-1 visa to bring specialized knowledge and managerial support in furtherance of the company's mission. *Id.*

61. Initially, HXXB USA expects to hire between 3 to 5 people and may expand its employee base to 20 employees within a few years. HXXB USA will employ at least one employee from HXXB, who will transfer from Beijing, China to Austin, Texas. *Id.* at ¶¶ 40, 49.

62. For HXXB USA to achieve its employment objectives, it is imperative that HXXB USA lease office space for at least three years. Per U.S. Immigration law, HXXB USA must rely on HXXB as a foreign entity to achieve these objectives. *Id.* at ¶¶ 50-51.

63. Pursuant to Vol. 2, Pt. L, Chapter 5 of the U.S. Citizenship & Immigration Services ("USCIS") Policy Manual,[22] and associated federal laws and regulations, for an applicant to be approved for an L-1 visa, he or she must have worked for a "qualifying organization" outside the United States. "An organization cannot transfer someone to work in the United States as an L-1 nonimmigrant, unless the organization has a qualifying U.S. entity to employ the L-1 beneficiary." *Id.*

64. USCIS regulations also expressly provide that when an employer/petitioner seeks to transfer an employee under an L-1 visa, the employer/petitioner bears the burden of establishing that it has secured physical premises that are "sufficient."[23]  This is established by evidence the employer/petitioner has obtained and will maintain a dedicated and functional office space for the position for at least one year.  A valid lease is required at the time of filing or the petition will be denied.[24]

65. According to the USCIS website, the processing time for an L-1 applicant is, on average, five months.[25]

66. HXXB USA cannot petition to transfer to its employment any L-1 visas for managerial employees or those with specialized knowledge to the State of Texas without violating either S.B. 17 or the USCIS regulations and policy. In fact, it is ***impossible*** for HXXB USA to comply with both simultaneously as HXXB USA cannot lease office space in Texas for at least one continuous year under the Challenged Provisions to satisfy U.S.

---

[22] Available at: https://www.uscis.gov/policy-manual/volume-2-part-l-chapter-5.
[23] *See* 8 CFR 214.2(l)(3)(v); USCIS Policy Manual, L-1A Intracompany Transferee Executive or Manager, available at:  https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager?utm.
[24] *Id.*
[25] https://egov.uscis.gov/processing-times/

federal immigration law; nor can it lease office space for one continuous year plus the USCIS' own anticipated processing timeframe. *See* Zhang Decl. at ¶ 53.

**D. As a Direct Result of the Challenged Provisions and the Attorney General's enforcement Authority Under S.B. 17, Plaintiffs Have Already Suffered Constitutional Injury and Face a Continuing, Immediate Risk Of Further Irreparable Harm Absent This Court's Intervention.**

67. As demonstrated in detail, *supra*, Plaintiffs have already sustained financial injury under the Challenged Provisions by their inability to enter a lease for more than a year. Zhang Decl. at ¶ 59. They have spent sizeable deposits and overhead costs in negotiating leases they would have already fully executed but for the Challenged Provisions. *Id.* at ¶ 46. It is beyond question that Plaintiffs would already be occupying commercial real estate in Austin, Texas, but for the draconian, arbitrary and capricious standards of the Challenged Provisions. *Id.* at ¶ 45. In contravention of conflicting federal law, Plaintiffs have been categorically deprived of a property interest in the State of Texas without any opportunity for notice or a hearing. This scenario presents not a theoretical threat of injury, but an actual and ongoing injury.

68. Plaintiffs, including the agents/consultants of Plaintiffs responsible for locating office space and negotiating and signing a lease for commercial office space, have an immediate legitimate, reasonable, and legally cognizable fear that if they violate the Challenged Provisions, they will be charged with a crime. Zhang Decl. at ¶¶ 55-57.

69. In addition, Plaintiffs, and their agents and consultants, have an immediate, legitimate, reasonable, and legally cognizable fear of civil liability. *Id.* at ¶ 58.

70. Should they enter leases that they have spent time and resources thoughtfully and carefully negotiating, Plaintiffs could be liable to the State of Texas for at least $250,000 or 50% of the interest in the transaction, whichever is greater. This would be a significant cost,

especially since Plaintiffs reasonably anticipate that hiring costs and other startup costs will exceed more than $3 million.

71. Unless this Court enjoins the Attorney General from enforcing the Challenged Provisions, Plaintiffs will not be able to engage in foreign or interstate commerce in Austin, Texas, in violation of the U.S. Constitution, specifically (1) the Due Process Clause; (2) the Supremacy Clause; and (3) the Commerce Clause.

## CLASS ACTION ALLEGATIONS

72. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully stated herein.

73. Plaintiffs seek certification of the following narrowly defined class:

Entities or individuals injured by the Challenged Provisions through their prohibition from entering commercial real estate leases since September 1, 2025 (collectively referred to as "the class").

74. More specifically, Plaintiffs request certification of the class of entities and individuals that have been prohibited from entering a commercial lease since September 1, 2025, by S.B. 17:

    a. All U.S. companies or organizations that: (1) are controlled by parent companies or organizations that are headquartered in China but are not an agent of or affiliated with the Chinese government or an agent of or affiliated with the CCP and (2) intend or have intended to acquire a commercial leasehold interest in real property in the State of Texas as of September 1, 2025, the date the unconstitutional Challenged Provisions impacting the class became effective.

b. All U.S. subsidiaries and their parent companies, or organizations that: (1) are owned or controlled by individuals who are Chinese citizens and who are domiciled, as that term is defined by S.B. 17, in China, and (2) intend or have intended to acquire a commercial leasehold interest in real property in the State of Texas as of September 1, 2025.

75. This is the **_sole_** class of entities and individuals Plaintiffs request this Court to certify for this class action (hereinafter defined as "the class").[26]

76. A class action is authorized where key prerequisites are satisfied and the defendant, here, Attorney General Paxton, is charged with enforcing a law, effective September 1, 2025, that applies to the class. A permanent injunction enjoining Attorney General Paxton from enforcing the constitutionally infirm portions of S.B. 17, and a declaratory judgment declaring the Challenged Provisions as unconstitutional, will redress the injuries of the class. FED. R. CIV. P. 23(b)(2); *see also* FED. R. CIV. P. 23(a)(1-4).

77. Plaintiffs' claims are appropriate for class certification because they can prove their claims, on behalf of the entire class, using the same evidence, apply to each individual claimant.

78. *Numerosity*. The proposed class is so numerous and dispersed that joinder of all potential members is impracticable. Plaintiffs have been informed and reasonably believe that the number of class members includes numerous businesses.

79. *Commonality and Predominance*. This case involves questions of law or fact which are common to the class and these questions of law and fact will predominate over any questions concerning individual class members. The class's claims "depend on a common

---

[26] *Compare against Peng Wang v. Paxton*, No. 4:25-cv-03103, at *29-30 (denying preliminary injunction and certification of a class action on the basis that Plaintiffs challenged the **_entirety_** of S.B. 17, not just the provisions that applied to them). That is not the case here.

contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[A] single common question of law or fact is sufficient" if "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Yates v. Collier*, 868 F.3d 354, 361. (5th Cir. 2017). These questions of law and fact that are common include:

   a. Whether the federal immigration laws and regulations preempt the Challenged Provisions of S.B. 17 when applied to the class.

   b. Whether the Commerce Clause invalidates the Challenged Provisions, which prohibit the class from entering a leasehold interest of more than a year after September 1, 2025.

   These questions satisfy the principal requirement of commonality, namely, that there is at least one contention "that enables the class action to generate common *answers* apt to drive the resolution of the litigation." *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014).

80. *Typicality*. This element "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). Here, the "critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002). This element is satisfied when "claims arise from a similar course of conduct and share the same legal theory." *Id*. Plaintiffs' claims are typical of the other class members' claims. All class

23

members are injured in the same way as Plaintiffs, namely, they cannot acquire a leasehold interest in office space in Texas for more than one year because of S.B. 17. Plaintiffs advance the same legal theories on behalf of themselves and the class. There are no defenses that are unique to Plaintiffs that would render Plaintiffs atypical. Plaintiffs' claims and those of the class arise from the same operative facts and are supported by the same legal theories.

81. *Adequacy*. Plaintiffs do not have any interests that conflict with the interests of the class Plaintiffs seek to represent. Plaintiffs are both willing and able to serve as a class representative. Plaintiffs will be active participants in the litigation and will control the litigation to protect the interests of the class. Plaintiffs' counsels are experienced in complex class action litigation and Plaintiffs will prosecute this case vigorously. Accordingly, the interests of the class will be represented adequately and fairly by Plaintiffs.

82. *Superiority*. Certifying this case as a class action is the superior method to achieve a fair and efficient adjudication of this case. Plaintiffs and the class do not bring claims for damages. Thus, it would be impracticable for individual plaintiffs to sue the Attorney General to seek individual redress. Additionally, filing individual lawsuits against the Attorney General risks resulting in inconsistent and conflicting rulings. The class action method is more efficient and it has the benefit of one ruling by one court that governs the claims of the entire class. Additionally, the proposed class is manageable as the trial in this case could be administered easily without concern that members of the defined class would have individual triable issues.

83. *Ascertainability*. Although this Court has discretion to order notice to class members, FED. R. CIV. P. 23(c)(2)(A), the class is both adequately defined and clearly ascertainable. The class is subject to precise definition. Additionally, using publicly available databases, this Court will be able to "identify those entitled to relief, those bound by the judgment, and those entitled to notice." *A.A. v. Phillips*, No. 21-30580, 2023 U.S. App. LEXIS 1518 at *5 (5th Cir. Jan. 20, 2023).

84. Additionally, a class action is appropriate because the Attorney General will enforce the Challenged Provisions on grounds that apply "generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

85. S.B. 17, and the Attorney General's enforcement authority under same, prevents Plaintiffs and class members from acquiring leasehold interests in commercial real estate for terms of one year or more. Granting the requested permanent injunction and declaratory relief would provide relief to all members of the class. Plaintiffs and class members predominantly seek injunctive and declaratory relief. The only monetary relief Plaintiffs and class members seek are for those attorneys' fees that are incidental to their injunctive and declaratory relief. Lastly, the injunctive relief sought is specific to restraining the Attorney General from enforcing the Challenged Provisions against both Plaintiffs and the class members.

## CLAIMS

## CLAIM I: THE CHALLENGED PROVISIONS VIOLATE THE COMMERCE CLAUSE U.S. CONST. ART. I, § 8, CL. 3

86. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully stated herein.

87. The U.S. Constitution vests Congress with the **_exclusive_** authority to regulate foreign and interstate commerce. U.S. CONST. ART. I, § 8, cl. 3.

88. The Commerce Clause "confers rights, privileges, or immunities."

89. This power is "exclusive and plenary" and cannot be limited by the states. *Board of Trustees of the University of Illinois v. United States*, 289 U.S. 48, 56-57 (1933).

90. Congress's powers in foreign commerce are broader than in interstate commerce. *Kraft General Foods, Inc. v Iowa Department of Revenue and Finance*, 505 U.S. 71, 79 (1992). This is because foreign commerce implicates matters of national concern. *Id*.

91. The Dormant Foreign Commerce Clause limits state power to regulate foreign commerce. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 571-72 (1997); *Dennis*, 498 U.S. at 446 ("[T]he Court long has recognized that [the Commerce Clause] also limits the power of the States to erect barriers against interstate trade.").

92. The Foreign Commerce Clause protects foreign nations from "state legislation inimical to the national commerce [even] where Congress has not acted." *Barclays Bank Plc v. Franchise Tax Bd.*, 512 U.S. 298, 310 (1994).

93. One such concern is state discriminatory treatment against foreign commerce because such discriminatory treatment creates the potential for international retaliation. *See id.*; *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006) ("State regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce."). Laws that facially discriminate against foreign commerce are

26

"virtually *per se* invalid." *Piazza's Seafood World*, 448 F.3d at 750; *see also Kraft Gen. Foods*, 505 U.S. at 81.

94. Laws that facially discriminate against foreign commerce require compelling justification. *Kraft Gen. Foods, Inc.*, 505 U.S. at 81. Accordingly, laws that facially discriminate are presumptively invalid. *Piazza's Seafood World*, 448 F.3d at 751.

95. Nondiscriminatory laws that burden foreign commerce are unconstitutional if they "create a substantial risk of conflicts with foreign governments or "undermine the ability of the federal government to speak with one voice in regulating commercial affairs with foreign states." *Piazza's Seafood World*, 448 F.3d at 750.

96. Additionally, a state cannot violate the foreign commerce clause even if the state law is consistent with the purposes of federal law. *Piazza's Seafood World*, 448 F.3d at 751.

97. The Challenged Provisions facially discriminate against non-CCP-affiliated entities and individuals.  In singling out these individuals and entities for disparate treatment, without **_any_** necessary finding they pose **_any_** security risk, the Attorney General places good-faith Chinese entities and individuals interested in a long-term commercial lease at a disadvantage by categorically prohibiting them from entering such lease—without any need for an investigation. TEX. PROP. CODE §§ 5.253; 5.255(e). It also chills any technological investment in the State of Texas that would benefit, not just Plaintiffs, but the State. This is not reasonable or rational to anyone impacted—let alone injured, such as Plaintiffs and the class.

98. To overcome the presumption of violating the Commerce Clause, the Attorney General must show that the Challenged Provisions "serve[ ] a legitimate local purpose that cannot

be adequately served by reasonable nondiscriminatory alternatives." *Piazza's Seafood World*, 448 F.3d at 751.

99. In its legislative history, the State of Texas does not adduce evidence as to how preventing non-CCP affiliated Chinese businesses from establishing a commercial leasehold interest for more than in year in Texas serves a legitimate purpose. The Attorney General also has not, nor is he required under the Challenged Provisions to produce evidence demonstrating that preventing Chinese affiliated entities with no ties to the CCP, like Plaintiffs, from opening a commercial office space serves any State or national security interest. Plaintiffs would submit the facts demonstrate the opposite—the security interests of Plaintiffs and the State of Texas are aligned.

100. The State of Texas did not analyze whether it could achieve its purported security interests through means that were nondiscriminatory. Instead, while initially just preventing the Chinese government from purchasing real property or acquiring an interest in real property, the State unconstitutionally expanded the reach of S.B. 17 to include such broad categories that in application prevent most Chinese nationals and all Chinese businesses headquartered and all U.S.-based subsidiaries owned or controlled by the latter from acquiring a leasehold interest in commercial real property. Casting such a broad net against potentially thousands of impacted persons and entities, untethered to ***any*** reasonably and legitimately articulated security threat, is protectionist discrimination and violates the Commerce Clause. *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 449 (1979) (Foreign commerce is preeminently a matter of national concern. In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.).

28

101. Even if the Challenged Provisions are nondiscriminatory, which they are not, the statute still violates the Dormant Foreign Commerce Clause as it "creates a substantial risk of conflicts with foreign governments; or undermine[s] the ability of the federal government to speak with one voice in regulating commercial affairs with foreign states." *Piazza's Seafood World*, 448 F.3d at 750.

102. In matters of foreign commerce, "uniformity is essential." *Japan Line, Ltd.*, 441 U.S. at 448.

103. Because the Challenged Provisions place Chinese headquartered businesses and their U.S. subsidiaries at a disadvantage and instantly subject them to potential civil and criminal enforcement action by the Attorney General, the risk of China retaliating against American businesses may increase. *Japan Line, Ltd.*, 441 U.S. at 450 (noting risk of retaliation and that such retaliation "of necessity would be directed at American transportation equipment in general, not just that of the taxing State, so that the Nation as a whole would suffer."). This is particularly so when, in 2023, the United States had $126.9 billion invested in China.[27] Even more importantly, the Attorney General's authority under S.B. 17 risks undermining hard-fought and long-sought economic and trade deals struck ***within approximately the last month*** between the United States and China, to include agreements directly involving semiconductor research.[28] Given these recent events, the threat of retaliation in the instant matter is not a whimsical fancy—S.B. 17 could have a very real, immediate, and lasting impact on U.S./China foreign relations.

---

[27] U.S. Mission China, *U.S. Relations with China*, *available at* https://china.usembassy-china.org.cn/u-s-relations-with-china/ (Feb. 19, 2025) (last visited July 27, 2025).

[28] https://www.whitehouse.gov/fact-sheets/2025/11/fact-sheet-president-donald-j-trump-strikes-deal-on-economic-and-trade-relations-with-china/ (Deal will "[e]nd Chinese retaliation against U.S. semiconductor manufacturers and other major U.S. companies;" and "China will terminate its various investigations targeting U.S. companies in the semiconductor supply chain.").

104. S.B. 17 prevents the United States from speaking with one voice. The federal government does not prohibit Chinese or Chinese-affiliated businesses from acquiring or leasing commercial real property in the United States for semiconductor operations. Instead, the federal government exercises case-by-case discretion, as is its domain and prerogative. *See generally* 50 U.S.C. § 4565.

105. As it pertains to Plaintiff HXXB USA, as stated elsewhere in this Complaint, Plaintiff is a U.S.-based entity organized under the laws of the State of Michigan. The only characteristic that distinguishes it from other entities that are authorized to lease commercial space in the State of Texas is that it is a subsidiary of a Chinese-headquartered entity. Transferring key employees from overseas is a recognized and legitimate mechanism for establishing initial operations in the U.S. by international companies.[29] As detailed, *supra*, to transfer employees under the L-1 visa program to Austin, Texas, and, hence, gain an operational foothold in the State, under federal immigration law, HXXB USA must be owned and controlled by HXXB directly or by person(s) who own and control HXXB.

106. Disallowing HXXB USA from accessing local markets and facilities simply because of its efforts to comply with federal immigration law could not be a clearer example of a dormant Interstate Commerce Clause violation. Leasing commercial office space is an economic activity with clear interstate implications. A state may not prohibit a U.S.-based entity from securing the commercial space it needs to operate; particularly, where, as here, such prohibition prevents HXXB USA from entering the Texas market. Because S.B. 17

---

[29] *See generally*, USCIS Policy Manual, Vol. 2, Pt. L, Chapter 1.

imposes market-exclusionary restrictions based solely on Plaintiff's ownership or affiliation, the law is facially discriminatory and is *per se* invalid.[30]

107. This Court should declare the Challenged Provisions unconstitutional as violative of the Commerce Clause. This Court should then permanently enjoin the Attorney General from enforcing the Challenged Provisions. This Court should also award Plaintiffs their reasonable attorneys' fees in pursuing this action. 42 U.S.C. § 1988(b).

## CLAIM II: THE CHALLENGED PROVISIONS ARE PREEMPTED BY FEDERAL IMMIGRATION AND FOREIGN INVESTMENT STATUTES AND REGULATIONS, TO INCLUDE 50 U.S.C. § 4565, *ET SEQ.*

108. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully stated herein.

109. The Supremacy Clause of the U.S. Constitution states that the Constitution, federal law, and treaties are the supreme law of the land. U.S. CONST. ART. VI.

110. Although in our federal system of government, the states are sovereign, "any state law that contradicts federal law is preempted." *Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.,* 134 F.4th 326, 328 (5th Cir. 2025).

---

[30] *Dickerson v. Bailey*, 336 F.3d 388, 392 (5th Cir. 2003) (In facially discriminatory statutes against out-of-state economic interests, the United States Supreme Court holds that state laws discriminating against interstate commerce on their face are virtually *per se* invalid. The only way in which a state may escape a determination that it is engaging in constitutionally prohibited economic protectionism is if it can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives. Under this strict scrutiny, courts hold that the state bears the heavy burden to rescue its statutes. This burden is stringent: When a statute directly regulates or discriminates against interstate commerce or when its effect is to favor in-state economic interests over out-of-state interests, courts generally strike down the statute without further inquiry.); *see also Yamaha Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 563 (4th Cir. 2005) (A state law that discriminates against interstate commerce facially, in its practical effect or in its purpose, will be struck down under the dormant Commerce Clause unless the state demonstrates both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.).

111. In this matter, there are two types of preemption at issue: field preemption and conflict preemption. *Id*. State laws are preempted when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 329.

112. The Challenged Provisions are field preempted.  Field preemption occurs where "Congress occupies the entire field" therefore prohibiting even complimentary state legislation. *Arizona v. United States*, 567 U.S. 387, 401-02 (2012) (finding field preemption in immigration law). Field preemption reflects "a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id*. at 401.

113. The Constitution vests foreign policy power in the federal government. *See, e.g.,* U.S. CONST. ART. I, § 8, cl. 3 (Congress has the power to regulate foreign commerce); ART. II, § 2, cl. 1 (vesting in the President the commander in chief power). Field preemption is always appropriate in the milieu of foreign affairs and foreign commerce as Congress vests the President with discretion over these areas. The President's authority is at its zenith when the President is operating with delegated authority from Congress because "it includes all that he possesses in his own right plus all that Congress can delegate." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003) ("[T]he Constitution entrusts foreign policy exclusively to the National Government."); *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs not shared by the States; it is vested in the national government exclusively."); *United States v. Belmont*, 301 U.S. 324, 331 (1937) ("Complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states.").

114. A state law is preempted when it "disturbs foreign relations" or "establishes its own foreign policy" even where there is no conflict or obstacle with federal law. *Zschernig v.*

32

*Miller*, 389 U.S. 429, 440-41 (1968) (striking down Oregon law that permitted immigrants from inheriting land unless they could show the immigrant's country of birth granted reciprocal rights to Americans because such a requirement made it inevitable that Oregon judges would criticize authoritarian nations and therefore "affect[ ] international relations in a persistent and subtle way."); *Garamendi*, 539 U.S. at 419 n.11 (observing that field preemption might be appropriate where a state government took a position on a foreign policy issue regardless of whether a conflict was present).

115. Acting through this plenary foreign policy authority, and with the twin goals of encouraging foreign investment while also protecting national security, Congress vested in the President the discretion over deciding which foreign investments are permitted and which foreign investments are prohibited. *See generally* 50 U.S.C. § 4565. Even when certain transactions may pose a national security threat, Congress vested the President and the Committee on Foreign Investment in the United States ("CFIUS") with the power to negotiate, enter, and enforce agreements to mitigate the threat of national security. *Id*.

116. Although the President has the authority to prohibit certain transactions, 50 U.S.C. § 4565 (d)(1), since 1975, the President has only done so nine times.

117. In singling out Chinese-headquartered businesses or their U.S.-based subsidiaries, without any rational basis, as persons or entities who are automatically barred from acquiring a long-term leasehold interest in commercial property the Challenged Provisions do not neutrally apply the State's police power in any sense of the term. It is the defendant's position that because China, a State Actor, is an adversary to the United States, that all Chinese headquartered, owned, or affiliated businesses are a security threat to the State of Texas and the United States. Such blanket foreign policy pronouncements on phantom

33

"security threats," created out of whole cloth, and completely devoid of any facts, context, investigation, or federally supportive law or regulation, cannot withstand the barest of scrutiny under the U.S. Constitution. This scenario is **_exactly_** what the U.S. Constitution was designed to prevent against. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 366 (2000) (Massachusetts law invalidated under the Commerce Clause as it undermined the intended purpose and natural effect of the President's discretion to control diplomatic strategy against Burma); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (state law preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

118. Because both the Congress and President have plenary authority derived from the U.S. Constitution to act with national power in the realm of foreign affairs, and because Congress vested the President with the discretion over certain foreign investment transactions, Congress has preempted the field. Furthermore, the State of Texas is making its own foreign policy decisions, taking a position on distinct foreign policy issues in a manner divorced from President Trump's recent pronouncements and foreign policy activity. The Attorney General's authority under S.B. 17 is therefore clearly and unambiguously preempted under the doctrine of field preemption.

119. The Challenged Provisions are also preempted under conflict preemption.

120. State law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 406 (2012).

121. Congress vested the President with substantial authority and discretion to negotiate in the field of foreign policy. Congress has given the exclusive authority to the President, in part

through CFIUS assistance, to achieve foreign policy results. *See, e.g.,* 50 U.S.C. § 4565, *et al.*, (CFIUS review procedures); (non-exhaustive list of factors for CFIUS to consider when assessing national security concerns of a transaction); (CFIUS's ability to negotiate and impose mitigation agreements); (unreviewable presidential discretion to suspend or prohibit certain transactions); (instructing the President to develop a common plan with U.S. allies concerning technology trends that could pose a risk to U.S. national security).

122. Congress has imbued the President with utmost discretion. Congress vested the President with the diplomatic right of access to the U.S. economy, to include the State of Texas. By prohibiting Chinese non-CCP affiliated businesses from leasing commercial office space in Texas, the State is diminishing the value of the President's diplomacy. *See, supra*. Because of the Challenged Provisions, the President no longer has full and complete authority as to whom can access the U.S. economy. The State of Texas' economy is not fully open to Chinese businesses, or, more pertinently, U.S.-based entities with ties to entities or individuals unaffiliated with the CCP. Congress has vested in the President the full might of diplomatic control over relations with China. The Challenged Provisions of S.B. 17 have emboldened the Attorney General with unequivocally frustrating Congress's purpose, and the President's, to include President Trump's, policy missions and agenda.

123. Make no mistake: Plaintiffs are allies to the United States' security and technology objectives, and there is no evidence to the contrary to suggest otherwise. Congress has instructed the President to collaborate with allies to develop a common approach to investments and technology that could pose a risk to the national security of the United States and our allies. 50 U.S.C. § 4565(c)(3)(A); *id*. § 4565(c)(3)(A)(i). The Challenged Provisions of S.B. 17 have risked alienating allies.

124. The Challenged Provisions harm the President's ability to speak with one voice in trying to reach a harmonious approach to common threats with our allies, to include Plaintiffs. The Attorney General should work with Plaintiffs in furtherance of their common mission as opposed to precluding them from operating in the State of Texas.

125. S.B. 17 "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." *Crosby*, 530 U.S. at 381.

126. The foreign policy mission of the United States is to accomplish its twin goals of encouraging foreign investment and protecting national security. The Challenged Provisions do not further these goals—far from it. Congress directed the President to use discretion on a case-by-case basis. *See generally* 50 U.S.C. § 4565. Where national security threats exist, Congress vests CFIUS with the authority to negotiate, enter into, and enforce mitigation agreements.

127. By contrast, the Attorney General, through enforcement of the Challenged Provisions, is categorically prohibiting all Chinese businesses headquartered in China from leasing commercial office space. This conflicts with Congress's purpose of encouraging foreign investment and using less draconian means to mitigate national security threats.

128. Lastly, Congress chose not to impose criminal sanctions for CFIUS statute violations. Instead, Congress chose to rely on civil enforcement mechanisms and not add any new criminal sanctions. 31 C.F.R. § 800.901(a)(1); *id*. § 802.901(a).[31]   By contrast, the Challenged Provisions impose criminal sanctions on individuals. TEX. PROP. CODE § 5.258(a)(2)-(b). S.B. 17 therefore conflicts with Congress's choice that in attempting to

---

[31] Neither Congress nor CFIUS creates any criminal penalties to enforce the CFIUS related statutes. In its regulations, CFIUS notes that its civil penalty provisions are without prejudice to other criminal enforcement mechanisms available under the law. 31 C.F.R. § 800.901(i); *id*. § 802.901(h).

attract foreign investment, the criminal penalties should not be imposed. *See Arizona*, 567 U.S. at 406.  Doing so creates an obstacle to Congress's carefully calibrated regime towards foreign investment. *See id*.

## CLAIM III: THE CHALLENGED PROVISIONS ARE VOIDED BY THE DUE PROCESS CLAUSE

129. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully stated herein.

**A. Procedural and Substantive Due Process.**

130. The Challenged Provisions automatically void any commercial lease exceeding one year entered into by any entity owned or controlled by an entity headquartered in China, without any notice, hearing, investigation, or individualized determination. TEX. PROP. CODE § 5.255(e). The statute provides no procedures for determining whether an alleged lessee poses a security threat, no standards governing how or when an investigation should occur, and no mechanism for contesting the State's automatic nullification of commercial leasehold property rights. *Id.*

131. The Attorney General is empowered to enforce the statute immediately upon execution of a covered leasehold interest, refer individuals for criminal prosecution, and seek civil penalties and divestiture, all without any pre-deprivation process. §§ 5.255(e)–5.259. The automatic voiding of a leasehold interest and imposition of severe penalties without an opportunity to be heard violates fundamental procedural due process considerations.[32]

132. The Challenged Provisions also infringe upon due process by criminalizing wholly passive, innocent conduct—entering a standard commercial lease—based solely on an entity's foreign ownership or national origin. The bill establishes strict liability: if an entity

---

[32] *See* FN 12-16, *supra*.

is covered, the act of signing a lease longer than one year is automatically voided and, without regard to intent, knowledge, risk, or actual harm, a person or entity associated with the lease may immediately be referred to prosecution. § 5.255(e). There is no need for the Attorney General, under the Challenged Provisions, to establish any procedures to determine if a violation has occurred with reference to a commercial leasehold interest.

133. A matter may be referred by the Attorney General for prosecutorial inquiry without any showing that the lessee engaged in wrongful conduct or posed any security threat. §§ 5.258–5.259.

134. Longstanding Supreme Court precedent holds that criminalizing passive status without notice or inquiry violates fundamental fairness. *Lambert*, 355 U.S. at 228–30. Likewise, imposing felony-level or quasi-criminal strict liability for ordinary commercial conduct impermissibly punishes morally innocent behavior. *Staples*, 511 U.S. at 618–19. S.B. 17's strict-liability framework is arbitrary, irrational, and bears no reasonable relationship to any legitimate governmental objective.

135. By subjecting Plaintiffs to criminal and civil penalties and restrictions on ordinary commercial activity based solely on national origin or foreign affiliation, the Challenged Provisions burden Plaintiffs' liberty interests without justification or procedural safeguards. These penalties are imposed without an individualized determination that Plaintiffs' conduct threatens public safety or national security, rendering the statute constitutionally infirm.[33]

**B. Deprivation of Property Interests.**

---

[33] *Id.*

136. Plaintiffs possess constitutionally protected property interests in contract formation, leasehold acquisition, and the ability to conduct lawful commercial business within the State of Texas. By invalidating lease agreements automatically and mandating divestiture of interests in real property without meaningful process, the Challenged Provisions deprive Plaintiffs of property rights in a manner that is neither narrowly tailored nor procedurally adequate. Such automatic divestiture is *per se* unconstitutional under the Due Process Clause. *See, e.g., Simi Inv. Co. v. Harris County*, 236 F.3d 240, 242 (5th Cir. 2000) (County had abused its governmental power and violated plaintiff's substantive due process rights where the basis for infringing on the plaintiff's property rights was arbitrary and capricious); *see also Dennis*, 498 U.S. at 446 ("The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right, whether the 'property' in question be a welfare check, a home, or a savings account.").

**ATTORNEYS' FEES**

137. Ordinarily, attorney fees awards are unavailable in federal preemption claims. *Planned Parenthood v. Sanchez*, 480 F.3d 734, 738 (5th Cir. 2007).

138. However, "where a plaintiff prevails on both a § 1983 claim and a Supremacy Clause claim that are based on a "common nucleus of operative facts," the plaintiff may recover attorneys' fees for both claims. *Id*.  at 739. Because the Commerce Clause claim, the Federal Preemption claim, and the Due Process Clause claim are based on the common nucleus of operative facts, if Plaintiffs prevail on all claims, they are entitled to recover their attorneys' fees.

139. Accordingly, if Plaintiffs are successful on all their claims, this Court should award HXXB its reasonable attorneys' fees for all claims.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, HXXB and HXXB USA and on behalf of the members of the class proposed in this Complaint, respectfully request the following:

A. Declare that this is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Declare the Challenged Provisions are unconstitutional as applied to Plaintiffs and the class members;

C. Permanently enjoin the Attorney General from enforcing the Challenged Provisions against Plaintiffs and class members;

D. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b); and

E. Award any other relief that this Court deems just and necessary.

Respectfully submitted,

DATED:        December 4, 2025

> Respectfully submitted,
>
> <u>/s/ Laura E. Schut</u>
> Laura E. Schut
> Tx. Bar. No. 24161306
> *Attorney in charge for Plaintiffs*
> HXXB USA Research Center
> 281-755-3824
> Laura.Schut@HXXB.org